UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| KEITH A. BRIGHT, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) 4:13 CV 1847 JMB |
| CAROLYN COLVIN, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## **MEMORANDUM AND ORDER**

Keith A. Bright ("Plaintiff") appeals the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability benefits under the Social Security Act (42 U.S.C. § 401 *et seq.*). This Court has jurisdiction over the matter under 42 U.S.C. §§ 405(g) and with the parties' consent under 28 U.S.C. § 636(c). Because the decision of the Commissioner is not supported by substantial evidence, it must be reversed and remanded.

## **I.     Background and Procedural History**

On July 27, 2009, Plaintiff filed applications for disability benefits under Titles II and XVI of the Social Security Act, with an alleged onset date of July 24, 2009. (Tr.[1] 113-19, 120-22, 208) Plaintiff's applications were denied on November 17, 2009, and he requested a hearing before an administrative law judge ("ALJ"). (Tr. 62-71) On December 6, 2010, following a hearing, the ALJ found that Plaintiff was not disabled. (Tr. 19-28) On September 14, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4) Next, Plaintiff filed a complaint in the United States District Court.[2] The Court reversed and remanded because the ALJ failed to consider all the relevant evidence in making his determination that Plaintiff's medically

---

[1]     "Tr." refers to the administrative record filed by Defendant. (13-1 through 13-22)
[2]     The Hon. Rodney Sippel, United States District Judge, referred the matter to the Hon. David Noce, United States Magistrate Judge, for a Report and Recommendation, which was adopted. (4:11-CV-1892) (E.C.F. No. 15, 16)

1

determinable impairments did not rise to the level of disability. (Tr. 617-40) On July 25, 2013, after a second administrative hearing, the ALJ again found Plaintiff was not disabled. (Tr. 520-38) Because Plaintiff did not file exceptions to the July 25, 2013 decision, and the Appeals Council did not assume jurisdiction, the July, 2013 decision stands as the final decision of the Commissioner. See 20 C.F.R. § 404.984(d).

## II.     Issues Before the Court and Summary of Decision

Although the ultimate issue here is whether there is substantial evidence to support the Commissioner's decision, the parties specifically dispute whether the ALJ: (1) properly evaluated the severity of Plaintiff's pain; (2) properly evaluated the Plaintiff's credibility, particularly relating to his subjective complaints of pain; and (3) properly weighed the medical evidence in determining Plaintiff's residual functional capacity ("RFC").

After a thorough review of the record, this Court finds that the decision of the Commissioner is not supported by substantial evidence because the ALJ did not consider all of the relevant medical evidence in the record, and therefore, it must be reversed and remanded.

## III.    Background Factual Matters and Medical Evidence

Plaintiff is a 44 year-old man alleging impairment due to degenerative disc disease, disc herniation, sciatica, and mental health issues including migraine headaches. (Tr. 159, 527)

### A.   Medical Evidence Relating to Plaintiff's Impairments

#### 1.   Plaintiff's Back Impairments

The documentation of Plaintiff's alleged back injuries begins in December of 2007, when he was seen at the emergency department of Barnes Jewish Hospital for complaints of neck and lower back pain resulting from a car accident. The medical evidence from this visit includes x-rays of the lumbar spine which revealed normal alignment, no fractures, preserved disc spaces,

and unremarkable soft tissues. Plaintiff was diagnosed with neck and lumbosacral strains. Plaintiff was feeling better later that day, and he was discharged and given prescriptions for various painkillers. (Tr. 281-82, 288-91, 297-98)

Shortly after this incident, on December 17, 2007, Plaintiff returned to the emergency department with complaints of additional neck pain. Even though x-rays at this time were negative, he was prescribed pain killers such as Oxycodone. (Tr. 268-75)

Thereafter, Plaintiff was seen on multiple occasions from January 2008 to July of 2009 at various emergency rooms for complaints of back, wrist, neck, and lower back pain. (Eg. Tr. 244-47, 211-18, 220-24) In all of these instances, x-rays showed generally normal alignments, no fractures in his hip, shoulder or spine, and well-maintained lumbar spine disc spaces.

By August of 2009, though, Plaintiff's spinal condition was deteriorating due to recent spinal injuries.[3] For example, an MRI at that time indicated severe narrowing of the lateral recess and neural foramina at L5-S1 with an S1 nerve root impairment. (Tr. 336) At this point, Plaintiff's back issues were significant enough to necessitate surgery; and on August 30, 2009, Dr. Paul Santiago, M.D., performed a left L5-S1 open micro discectomy. (Tr. 331-33)

This was apparently a successful surgery that relieved Plaintiff's root nerve compression. When Plaintiff visited Chad Washington, M.D., on October 2, 2009, Dr. Washington noted that Plaintiff was doing well and that his leg pain had greatly improved. Plaintiff had full lower extremity strength and equal and symmetric reflexes; the incision was well healed. Dr. Washington cleared Plaintiff to gradually return to normal activity and imposed no other restrictions or limitations on him. (Tr. 400) During follow up in December of 2009, Plaintiff

---

[3] For example, on July 24, 2009, Plaintiff went to the emergency room, complaining of back pain after he "popped his back when lifting a moped the night before," and then woke up with weakness in his back and leg numbness in addition to his back pain. (Tr. 220-24, 229-31, 238, 241)

3

saw Dr. Matthew Reynolds, M.D., who noted that Plaintiff had made an "excellent recovery, and did not need further follow up." (Tr. 393)

But shortly thereafter, Plaintiff claims his back issues began to return. Plaintiff began seeing a new primary care provider around this time—Dr. Robert Holloway, M.D. In December, 2009, Dr. Holloway examined Plaintiff and diagnosed him with lumbago, cervicalgia, and migraine headaches. Dr. Holloway also noted decreased range of motion of the L-spine to flexion/extension and lateral rotation. (Tr. 444) Plaintiff's complaints and a physical examination led Dr. Holloway to prescribe strong painkillers such as Vicodin and Methadone. (Tr. 430-31) On June 22, 2010, Plaintiff reported doing "horrible," even after these treatments. Dr. Holloway prescribed more pain killers. (Tr. 492-93)

Also on June 22, 2010, Dr. Holloway opined in a Medical Source Statement ("MSS") that Plaintiff suffered from lower back pain, and that this impairment effected Plaintiff's endurance, requiring him to rest. (Tr. 457) Dr. Holloway also noted in his clinical findings that there was a high level of concordance between Plaintiff's subjective complaints of pain and the clinical findings. (Tr. 444) Indeed, from June 22, 2010 to October 14, 2010, Plaintiff received more prescriptions for Methadone and Norco. (Tr. 488-93, 515)

Dr. Holloway continued to treat Plaintiff between October 14, 2010 and April 27, 2011. (See Tr. 964, 972-73, 990, 999, 1004, and 1015) During this timeframe, Dr. Holloway continued to refill Plaintiff's pain medications, continued to make clinical findings indicative of back impairments, and continued noting that the concordance between Plaintiff's subjective complaints of pain and the clinical findings was high. (See Id.)

Additionally, in September, 2010, Plaintiff saw Dr. Faisal Albanna, M.D., for an evaluation of low back pain. Dr. Albanna's examination revealed evidence of stiffness and

tenderness, decreased cervical range of motion, decreased lumbar range of motion, flexion with pain, decreased extension with pain, abnormal posture, severe guarding of the LS-spine, and mild guarding of the cervical spine. (Tr. 500-02)

During this exam, Plaintiff was evidently unable to walk on his heels and toes because of his low back pain. Straight leg raise testing was negative on the right side, but positive on the left side 30 degrees, with pain radiating. Dr. Albanna opined that Plaintiff would be unable to return to his original physically demanding job, would eventually need surgery, and would benefit from lumbar fusion and stabilization to address his mechanical and neurological issues. Dr. Albanna also opined that x-rays of five lumbar non-rib bearing vertebrae revealed: degenerative changes, mild and moderate; degenerative disc disease at L5-S1; laminotomy at L5-S1; post-operative changes; and retrolisthesis at L5-S1.[4] (Tr. 500-02, 508)

### 2. **Plaintiff's Mental Health Impairments**

Plaintiff also alleges various mental health impairments, along with migraine headache issues. Toward the beginning of his mental health treatment, Plaintiff was seen at Mental Health Specialists. Plaintiff underwent a mental status exam on December 5, 2011. Plaintiff was given a Global Assessment of Functioning Score of 30, and diagnosed with mood disorder, not otherwise specified. (Tr. 848) At that exam, Plaintiff presented a tearful and depressed affect, anxious and depressed mood, and limited memory, attention span, and conversation. (Tr. 849)

Plaintiff's migraine and mental impairment issues were also treated at People's Health Centers ("Peoples"). (Tr. 872-82) Plaintiff's initial exam at Peoples was on October 16, 2012.

---

[4] Some of the medical evidence from that same time, however, was positive. During the time that Plaintiff was seeing Dr. Holloway, he also saw Dr. Gurpreet Padda, M.D., for lumbar corticosteroid injections for his various spinal ailments. Dr. Padda noted nearly "complete resolution of radicular symptoms within fifteen seconds of the procedure." (Tr. 412-14) Further injections by Dr. Padda on February 27, 2010 and March 15, 2010 were also successful in immediately reducing Plaintiff's pre-procedure symptomology. (Tr. 408-11) Also, when Plaintiff went to the emergency room on July 23, 2011, MRIs revealed mostly normal thoracic and lumbar spine results. The thoracic spine was "unremarkable;" there was evidence of mild degenerative disc disease at L4-5 and L5-S1, and mild neural foraminal stenosis at L5-S1. (Tr. 913-18) Plaintiff's spinal condition was "stable." (Tr. 924)

He presented with a "depressed mood, diminished interest or pleasure, excessive worry, fatigue, feelings of invulnerability and thoughts of death or suicide." (Tr. 875) Plaintiff was diagnosed with "moderate depression." (Tr. 876) But on October 25, 2012, Plaintiff was oriented to time, place, person, and situation, and demonstrated appropriate mood and affect. Plaintiff's bi-polar condition was "stable on current medication." (872-73) In December, 2010, Plaintiff had a CT scan in the course of treatment for complaints of migraines. The results were normal, and indicated no intracranial hemorrhage, extra-axial blood or fluid collection, lesion, mass effect, or midline shift. (Tr. 842, 989)

Dr. Surendra Chaganti, M.D., also treated Plaintiff for mental health issues. On June 13, 2012, Dr. Chaganti noted that Plaintiff was not sleeping well, but was not depressed. Plaintiff had a psychiatric evaluation on July 28, 2012, during which Dr. Chaganti did not observe significant mental impairments. Although Plaintiff had a guarded insight, judgment and prognosis, Dr. Chaganti observed that Plaintiff had a sequential flow of thought, adequate energy, a composed affect, and logical thought process. Dr. Chaganti thought that Plaintiff was only "mildly ill." (Tr. 883-84)

### B. Medical Opinion Evidence

#### 1. Dr. Holloway

In an MSS completed in June of 2010, Dr. Holloway diagnosed Plaintiff with "lumbago, lumbar radiculopathy, and cervicalgia" and lower back pain. (Tr. 457) When asked whether Plaintiff's endurance would be affected by the impairment, and how many hours during an eight hour workday he would have to rest, Dr. Holloway claimed Plaintiff would have to rest for one hour. (Id.) Dr. Holloway declined to answer whether the impairments prevented Plaintiff from working in a sedentary position. Dr. Holloway stated that his opinion as to whether the condition

6

would prevent Plaintiff from working for at least twelve months was "pending neurology referral." (Id.) Dr. Holloway's treatment notes, however, described symptomology indicative of back impairment and documented a high concordance of subjective complaints of pain to objective clinical findings. (See, e.g., Tr. 444, 447, 449)

### 2. **Dr. Doty**

On April 4, 2013, Dr. Catherine Doty, M.D., submitted an MSS. In her opinion, Plaintiff had a current diagnosis of migraine headaches, neck and back pain, "SI joint arthropathy and dysfunction and radiculopathy." (Tr. 1054) Plaintiff's symptoms included headaches, and back and neck pain of "variable intensity." Dr. Doty prescribed physical therapy, chiropractic care, and methadone. Dr. Doty opined that Plaintiff's pain would only occasionally be so severe as to interfere with his ability to concentrate and maintain attention. (Id.) Dr. Doty expressly stated that Plaintiff "should be able with reasonable breaks and proper ergonomics to perform sedentary work." Dr. Doty also said that in the past, (from September 28, 2011 until the time of the MSS) there were times where full-time employment was not realistic, and there were times when sedentary work would have been appropriate. (Tr. 1054) Dr. Doty limited Plaintiff to lifting and carrying up to 15 pounds, sitting six hours out of an eight-hour work day, and never stooping, crouching, or crawling. Dr. Doty indicated Plaintiff may require position changes and may be limited in lifting and walking if he is in the midst of a pain exacerbation. (Tr. 1055)

### 3. **Dr. Wheeler**

Matthew Wheeler, D.C., completed an MSS on January 31, 2013. (Tr. 890-91) Dr. Wheeler described Plaintiff's impairments as low back pain, neck pain, and headaches; he recommended chiropractic treatment and pain medication. Dr. Wheeler opined that Plaintiff's pain would "frequently" interfere with the ability to maintain attention and concentration.

7

Finally, Dr. Wheeler said Plaintiff is precluded from full-time, sedentary work. (Id.) Dr. Wheeler also opined as to the following exertional limitations: (1) Plaintiff can carry twenty pounds occasionally, ten pounds frequently; (2) he can stand/walk three hours out of an eight hour day; (3) he can sit only three hours in an eight hour day; and (4) he would have to rest for five hours out of every eight hour day. (Tr. 891)

### C. Other Evidence in the Record

On August 27, 2009, Plaintiff filled out a Function Report-Adult form. Plaintiff reported living in an apartment with a roommate, and listed his daily activities as getting up, taking pain medication, taking a hot bath, laying on the couch, eating, and going to bed. Plaintiff prepared his own simple meals daily and did his laundry when on his pain medication, but he needed someone else to carry his clothes up and down the stairs. Plaintiff did not do house or yard work because of constant back pain and reported that his injury was worsening every week. (Tr. 178-85)

At his first hearing on July 14, 2010, Plaintiff (with counsel) testified as to his work history, as well as the impairments that allegedly make him disabled. Plaintiff testified to his spinal surgery in August of 2009, and said that despite receiving injections and surgery, his pain continued to worsen. Plaintiff said he spends an average of seven hours a day lying down to relieve his spinal pain. According to the hearing transcript, Plaintiff was unable to sit throughout the hour-long hearing without standing to adjust and relieve his pain. (Tr. 29-52)

After remand by this Court, the ALJ held a second hearing on March 12, 2013, at which Plaintiff (with counsel), and a Vocational Expert ("VE") testified. (Tr. 573-99) The ALJ questioned Plaintiff about any history with substance abuse; Plaintiff denied any such history. Plaintiff then testified in more detail regarding his previous work history, including jobs as a

manager at Steak-n-Shake, work as a truck driver, a pizza delivery job, and a position at a firm called Schroeder and Tremayne, where he did "shipping and receiving" work. (Id.)

At this hearing, a VE testified that Plaintiff could work as: (1) an addresser, which has a Dictionary of Occupation Titles ("DOT") number of 209.587-010, and 450 jobs regionally, as well as 12,493 jobs nationally; and (2) an assembler, which has a DOT number of 734.687-018, and has 7,660 jobs nationally, and 234,910 jobs nationally. (Tr. 565, 596)

## IV. <u>The ALJ's Decision</u>

In assessing whether Plaintiff was disabled, the ALJ followed the five step process laid out in the Commissioner's regulations. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity on the alleged onset date and the date of last insured. (Tr. 523) At Step Two, the ALJ found that Plaintiff suffered from multiple severe impairments, including "degenerative disc disease and degenerative joint disease of the cervical and lumbar spine, migraine headaches, and mood disorder, not otherwise specified." (Id.) At Step Three, the ALJ found that none of those impairments, individually or in combination, met or equaled one of the listed impairments; thus, Plaintiff was not presumptively disabled. (Tr. 523-26)

At Step Four, the ALJ found that Plaintiff has the RFC to: lift and carry ten pounds frequently and less than ten pounds occasionally; stand or walk two hours out of an eight-hour work day; sit six hours out of an eight-hour work day; and never climb ropes, ladders, or scaffolds. Plaintiff can occasionally climb stairs and ramps, as well as stoop, kneel, crouch, and crawl; but Plaintiff cannot perform work that requires repetitious use of foot controls. He must avoid concentrated exposure to unprotected heights and vibration. Plaintiff is able to understand, remember, and carry out at least simple instructions and perform non-detailed tasks, respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others

9

is casual and infrequent. Plaintiff should not work in a setting which includes constant/regular contact with the general public, and should not perform work which includes more than infrequent handling of customer complaints.[5] (Tr. 526)

Because Plaintiff retained some capacity to work, the ALJ's Step Four analysis proceeded to consider Plaintiff's ability to do his past work. The ALJ found that Plaintiff was unable to perform his past work. (Tr. 536) The ALJ then moved on to the fifth and final step.

At Step Five, the ALJ used the testimony of the VE to establish that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed through the date of last insured, thus finding Plaintiff was not disabled. In posing his question to the VE, the ALJ asked the VE to take into account Plaintiff's age, his education, the fact that he was able to communicate in English, his past work experience and his RFC. (Tr. 537)

In formulating Plaintiff's RFC, the ALJ made several credibility determinations. The ALJ discounted Plaintiff's credibility in describing the extent of his symptoms and pain. The ALJ also discounted the weight of Plaintiff's treating physician, Dr. Holloway, and his chiropractor, Dr. Matthew Wheeler, D.C. Finally, the ALJ gave some weight to Dr. Doty's recommendations.

## V.     **Standard of Review and Legal Framework**

This Court reviews the final decision of the Commissioner to ensure that it is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); and Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence is "less than a preponderance but is enough that a reasonable mind would find it adequate to support the commissioner's

---

[5]  The ALJ appears to have made a typo in his written decision. In that decision, he found that Plaintiff can carry ten pounds frequently and less than ten pounds occasionally. The ALJ must have meant that Plaintiff can carry ten pounds occasionally and less than ten pounds frequently—indeed, the ALJ phrased the RFC that way in his examination of the VE. (Tr. 596) This is a clerical and harmless error.

10

conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2003). Thus, the decision of the Commissioner may not be reversed solely because this Court might have decided the case differently. Id. at 1022. Instead, a reviewing Court must determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the Commissioner's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).

Additionally, this Court will determine whether the Commissioner faithfully applied the required five-step process to determine disability status. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process). Steps One through Three require the Plaintiff to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his disability meets or equals a listed impairment. If the Plaintiff does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the Plaintiff retains the RFC to perform his previous work. If the Plaintiff proves he cannot do so, then the burden switches to the Commissioner at Step Five to prove that there is work in the national economy that the Plaintiff can do, considering his age, work experience, education, and RFC. (Id.)

## VI. Discussion

The broad issue in this case is whether the final decision of the Commissioner is supported by substantial evidence on the record as a whole. More particularly, the questions are whether the ALJ: (1) properly evaluated the severity of Plaintiff's pain; (2) properly evaluated Plaintiff's credibility, particularly relating to his subjective complaints of pain; and (3) properly weighed the medical evidence in determining Plaintiff's RFC.

11

On the present state of the record, the Court cannot definitively answer those questions, and cannot say that substantial evidence supports the ALJ's decision. Primarily, this is because it appears to the Court that the ALJ overlooked potentially important treatment records when weighing the medical evidence. As explained in greater detail below, the ALJ "disqualified" one of Plaintiff's treating physicians, Dr. Holloway, and in the process, incorrectly concluded that Dr. Holloway did not treat Plaintiff after October 14, 2010. In fact, the record indicates that Dr. Holloway treated Plaintiff on at least seven occasions thereafter, until April 2011. Furthermore, the ALJ's error regarding Dr. Holloway's treatment history could potentially alter the ALJ's assessment of Plaintiff's credibility, as well as the weight to be accorded to the medical source opinions in the record.

On remand, the ALJ should review these additional treatment records, and integrate this evidence into his discussion of Plaintiff's credibility, as well as the weight given to the various medical sources, and discuss how this evidence impacts the ALJ's RFC analysis.

### A. ALJ's Incomplete Review of the Medical Records

In his written decision, the ALJ discussed the records of Dr. Holloway as follows:

Records from Dr. Holloway dated October 14, 2010 provide little clarity…[t]hese are not the observations generally characteristic of claimants with substantial spinal limitations, and they are inconsistent with Dr. Holloway's opinion. *This also appears to be the last time that the claimant saw Dr. Holloway.*

(Tr. 530) (emphasis supplied)

The ALJ was incorrect in observing that Dr. Holloway did not see or treat Plaintiff after October 14, 2010. In fact, Dr. Holloway saw Plaintiff on November 11, 2010, November 29, 2010, December 9, 2010, January 4, 2011, February 3, 2011, March 2, 2011, and April 27, 2011. (See Tr. 964, 972-73, 990, 999, 1004, and 1015)

12

During these visits, it appears that Plaintiff had his prescriptions refilled, he was examined, and the treating physician made clinical findings. For example, on March 2, 2011, Dr. Holloway's notes indicate that Plaintiff was suffering from increasing neck discomfort, increasing headaches, discomfort between the shoulder blades with superior radiation, and "emotional breakdown" and "increased stress." (Tr. 1003) Also during that visit, Dr. Holloway noted that the "concordance" of Plaintiff's subjective complaints to clinical findings was "high." (Tr. 1004). Plaintiff's medications were refilled, and Dr. Holloway ordered Plaintiff to come back again in one month to follow-up. Dr. Holloway also ordered Plaintiff to continue to follow up with Dr. Padda for his corticosteroid injections. (Id.) Other visits during this time are similar in findings and treatment. Yet the ALJ apparently never considered these records.

The problem here is that a failure to consider all of the evidence in a case, especially medical evidence from a treating physician, is error. Reeder v. Apfel, 214 F.3d 984, 987-88 (8th Cir. 2000) ("the ALJ is not free to ignore medical evidence but rather must consider the whole record"); see also 20 C.F.R. §404.1520(a)(3) ("we will consider all evidence in your case record when we make a determination or decision whether you are disabled"). Where an ALJ does fail to consider all the evidence, that can be reversible error. See Reeder, 214 F.3d at 988 (where the ALJ's opinion "appears to have ignored some of the medical evidence" it will be remanded).

Here, the ALJ missed several months of treatment records from Dr. Holloway, who was Plaintiff's primary care physician during this time. This evidence from a treating physician is important and relevant, and its omission requires remand so that the ALJ can examine it. (Id.) This is especially true where Dr. Holloway had submitted an MSS a few months earlier, and the follow-up medical records might shed some light on the propriety and accuracy of that statement. This is an issue for the ALJ, not the Court, to address in the first instance.

This failure to consider relevant treatment notes is magnified by the fact that there are at least some other medical records from around this general timeframe that might support a finding of disability, or affect an assessment of Plaintiff's credibility regarding the severity of his pain. For example, on September 28, 2010, (approximately two weeks before the ALJ concluded that Dr. Holloway stopped seeing and treating Plaintiff) Dr. Albanna noted during a physical examination that Plaintiff had decreased cervical and lumbar range of motion, abnormal posture associated with severe guarding of the LS spine and mild guarding of the cervical spine. Dr. Albanna went on to note that heel/toe walking tests reveal that patient is unable to walk on heels and toes because of low back pain. Straight-leg raise testing was positive left side 30 degrees and positive with pain radiating to the left buttocks, posterior thigh posterior calf and foot. Dr. Albanna noted that "sooner or later [Plaintiff] will need surgery and [Plaintiff] will benefit from lumbar fusion and stabilization to address the mechanical and neurological issues." (Tr. 502)

The ALJ seemed to recognize that this evidence was somewhat supportive of Plaintiff's allegations of disability because he then went on to contrast those findings with Dr. Albanna's observations that Plaintiff had normal muscle tone and full muscle strength. (Tr. 531) The ALJ did not further note how this medical evidence figured into his analysis.

Furthermore, Plaintiff underwent an MRI on July 23, 2011, that suggested potential continuing impairment at left L5-S1 post-micro discectomy. (Tr. 917-18) Plaintiff also had a nerve conduction study on September 28, 2011, that could be "suggestive of probable, respective L5/S1 nerve root pathology," and the findings of which "do not rule out the presence of a Small Fiber neuropathy, Peripheral Sympathetic neuropathy or Radiculopathy involving [other] nerve roots." (Tr. 1052) In his decision, the ALJ discounted some of these medical findings as

insignificant. (See Tr. 532) But the findings cannot be dismissed so easily where they are at least potentially corroborated by treatment notes that the ALJ overlooked.

Thus, the incomplete review of the medical records was error, and necessitates remand. See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (noting that "inaccuracies, incomplete analyses, and unresolved conflicts of evidence" are a proper basis for remand); see also Reeder, 214 F.3d at 988 (same).

### B. Plaintiff's Credibility

Another problem with the ALJ overlooking relevant, timely medical evidence from a treating physician—especially where the evidence regarding disability is mixed—is that that failure affects the ALJ's analysis of Plaintiff's credibility.

In evaluating Plaintiff's credibility, the ALJ was required to: (1) determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the Plaintiff's pain or other symptoms; and then (2) evaluate Plaintiff's allegations concerning severity by using objective medical evidence and the factors laid out in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In this case, the ALJ found that "some" of Plaintiff's allegations "have an evidentiary basis." (Tr. 529) The ALJ, however, went on to find Plaintiff "not entirely credible." (Tr. 536)

"In assessing a claimant's credibility, an ALJ must consider all of the evidence related to the subjective complaints, the claimant's daily activities, observations of third parties, and the reports of treating and examining physicians." McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) (emphasis supplied); see also Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (where objective evidence does not fully support the degree of severity in a claimant's subjective complaints of pain, "the ALJ must consider all evidence relevant to those complaints"). Here,

15

the ALJ overlooked several months' worth of treatment evidence by Dr. Holloway and therefore did not consider "all evidence" relevant to credibility determination. This is not a harmless oversight because those records have indications of serious clinical findings and often indicate that the concordance is high.

### C. Medical Opinion Evidence

The evidence that the ALJ overlooked is also relevant to this Court's analysis of the weight given to Dr. Holloway. Indeed, the ALJ discounted Dr. Holloway's opinions quite clearly. (Tr. 530) (noting that Dr. Holloway's opinion "provides absolutely no help" in the ALJ's RFC formulation) Again, however, the problem is that the ALJ discounted Dr. Holloway without taking into account all of the evidence. Thus, on remand, the ALJ should take into account the additional evidence, and should articulate how, if at all, the additional evidence changes his analysis of the weight given to Dr. Holloway's opinions.[6]

## VII. Conclusion

Therefore, upon remand, the ALJ should analyze the treatment notes of Dr. Holloway between October 14, 2010 and April of 2011. The ALJ should specifically articulate how, if at all, those additional notes change his evaluation of: (1) Plaintiff's credibility and subjective complaints of pain; (2) the medical source opinions; and (3) Plaintiff's RFC.

---

[6] In his opinion, the ALJ concluded that Dr. Holloway was "disqualified" from giving an opinion as to Plaintiff's disability. (Tr. 530) Although it is not entirely clear what the term "disqualified" means in the context of evaluating a treating source opinion, the ALJ's conclusion appears to rest on the mistaken belief that Dr. Holloway last saw Plaintiff in October 2010. Further, the term "disqualify" does not occur in any of the relevant provisions of 20 C.F.R. Part 404 subpart P. On remand, if Dr. Holloway is again "disqualified" from giving an opinion, the ALJ should reference a legal basis for that conclusion.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** for further proceedings consistent with this Memorandum and Order.

A separate order of Judgment shall be entered this day.

                                            **/s/ *John M. Bodenhausen***
                                            JOHN M. BODENHAUSEN
                                            UNITED STATES MAGISTRATE JUDGE

Dated this 17$^h$ day of September, 2015.